# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 20-1504V

| | |
|---|---|
| HELEN ANGLEWICZ,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: February 8, 2024 |

*Nancy Routh Meyers*, Turning Point Litigation, Greensboro, NC, for Petitioner.

*Alexa Roggenkamp*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On October 30, 2020, Helen Anglewicz filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that following her receipt of an influenza ("flu") vaccine on September 16, 2019, she suffered a shoulder injury related to vaccine administration ("SIRVA"), as defined in the Vaccine Injury Table. Petition at ¶¶ 1, 24-25. I determined Petitioner was entitled to damages, but deferred resolution of that issue, to allow the parties to attempt to resolve it themselves – but they were unable to do so.

For the foregoing reasons, I find that Petitioner is entitled to compensation in the total amount of $134,085.12 (representing $130,000.00 for actual pain and suffering, plus $4,085.12 for unreimbursable expenses).

---

[1] Because this ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

I. **Relevant Procedural History**

The procedural history leading up to the Ruling on Entitlement issued on August 2, 2023 (ECF No. 44)[3] is summarized therein – and incorporated by reference here. Afterwards, the parties confirmed that they were unable to informally resolve damages reiterated their request for a decision based on the damages briefing previously submitted. Joint Status Report filed Sept. 14, 2023 (ECF No. 47). In light of the case's age and the atypical nature of the damages disputes – particularly with respect to lost wages – I transferred the case out of SPU and onto my regular docket for further proceedings. Notice of Reassignment entered on Nov. 29, 2023 (ECF No. 48). Petitioner followed up again, stating that the parties "presume[d] that the Court would enter a damages award based on the briefs previously filed and that nothing further is required of the parties at this time," noted via Informal Communication entered on Jan. 12, 2024 (Non-PDF). The matter is now ripe for adjudication.[4]

II. **Relevant Evidence**

After a complete review of the record in this case, I find that Section II of the Ruling on Entitlement (ECF No. 44) at 3 – 8, represents an accurate summary of the relevant facts in this matter. That aspect of the Ruling on Entitlement is fully incorporated and adopted, although additional facts pertinent to the damages determination will be added here.

III. **Damages**

Under the Vaccine Act, the petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate

---

[3] The Ruling on Entitlement was withheld from public posting in light of Petitioner's timely Motion of Redaction on Aug. 14, 2023 (ECF No. 45); *see also* Response filed on Aug. 25, 2023 (ECF No. 46); Order deferring ruling on Nov. 29, 2023 (Non-PDF).

[4] I also conclude that the medical records are sufficiently complete for adjudication of damages. The Ruling on Entitlement identified potentially outstanding urgent care records – but upon further review, those seem most likely to be from late 2021 or January 2022 – which is significantly attenuated from both Petitioner's initial treatment course for SIRVA and the claimed lost wages, and therefore, not crucial for resolving those issues.

2

my prior discussion in Sections I and II of *McKenna v. Sec'y of Health & Hum. Servs.*, No. 21-0030V, 2023 WL 5045121, at *1-3 (Fed. Cl. Spec. Mstr. July 7, 2023).[5]

### A. Lost Earnings

The Vaccine Act provides, where the injured party's "earning capacity is or has been impaired by reason of such person's vaccine-related injury," for recovery of "actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections." Section 15(a)(3)(A). Lost earnings calculations must be performed in a "cautious manner." *Brown v. Sec'y of Health & Hum. Servs.*, No. 00-0182V, 2005 WL 2659073, at *6 (Fed. Cl. Spec. Mstr. Sept. 21, 2005). And a lost earnings award "may not be based on speculation." *Moreland v. Sec'y of Health & Hum. Servs.*, No. 18-1319V, 2022 WL 10469047, at *3 (Fed. Cl. Spec. Mstr. Sept. 2, 2022).

Here, Petitioner requests $28,074.05 for past lost earnings. Brief at 12. She represents that she and her husband have equal ownership in a commercial and industrial LED lighting business. Ex. 11 at ¶ 2. She serves as Vice President, oversees the finances and administrative needs; and has assisted on sales calls and lighting installation jobs. *Id.* Her husband is the President, overseeing sales and installations. *Id.* at ¶ 4. Petitioner avers: "During the worst of my vaccine injury, and while I was recovering from surgery, I was unable to work. My responsibilities necessarily fell to my husband during this time, which took his time and attention away from sales and installations. The business suffered as a result." *Id.* at ¶ 3. "As owners, my husband and I do not take a traditional salary and do not receive a paycheck. Instead, we make periodic distributions from the company to ourselves." *Id.* at ¶ 4. She also avers that based on her 50% ownership share, 50% of each year's profits are attributable to her. *Id.* at ¶¶ 4 – 8; *id.* at pages 7 – 9 (business's profit and loss statements in 2018, 2019, 2020); Brief at 11 – 12 (multi-step calculation from gross profits to net loss earnings).

In opposing *any* award for past lost earnings, Respondent questions the extent that Petitioner's shoulder injury prevented her from working and suggested that the Pandemic also hurt her business's profits in 2020. Response at 17. Respondent also contends that Petitioner has "provided insufficient information to calculate actual and anticipated loss of earnings in accordance with generally recognized actuarial principles and projections" – which should arguably focus on *net* profit after deduction for ordinary business expenses, consider whether Petitioner could have mitigated any business impacts by temporarily compensating someone else to perform at least some of her

---

[5] This prior discussion informs my determination of damages notwithstanding that this case was transferred out of SPU.

3

responsibilities, and include additional detail about Petitioner's responsibilities and her hours. *Id.* at 17 – 18.

Petitioner replies that she should not be "ineligible" for an award of lost earnings because she is a small business owner; she has documented her business losses "as best she could"; "there is no way to quantify a percentage of business losses that are attributable to the COVID-19 pandemic," and that the Court may use its discretion in considering the pandemic's impacts on her business. Reply at 8. She has offered no additional evidence (not in the record at the time entitlement was decided) in support of this damages component.

I first emphasize that Petitioner's claim is appropriately limited to 2020, coinciding with the acute treatment for her shoulder injury. But as noted in the pain and suffering analysis, I find that the alleged business impacts attributable to her shoulder injury were most likely centered in January – April 2020, and certainly not continuing beyond July 2020, at which point she had achieved a substantial recovery and discontinued treatment. But this still leaves the question of what *quantum* of damages is justified, given the existing record.

In her Reply, Petitioner concedes that the Pandemic caused at least *some* disruptions to her business in 2020. From a review of the 2019 – 20 annual statements, the most dramatically decreased line item is "Sales – Commissions." Ex. 11 at 8 – 9. While Petitioner's affidavit suggests that her vaccine injury took her husband away from sales, it is also reasonable to conclude that they, and potential customers, were avoiding in-person contact during the Pandemic throughout 2020. (Consistent with Petitioner's own concerns, documented in both the contemporaneous medical records and her later affdiavits.) Respondent has raised additional, not unreasonable questions about how to calculate the business's profits that can be attributable to Petitioner – but there appears to be limited available documentation on those questions.

In the end, in making any damages calculation, I am limited to what is "reasonable," and specifically what figures proposed have sufficient evidentiary support. Here, Petitioner has both failed to defend the specific sums requested, but also more broadly not demonstrated that the claimed lost wages were *in fact* lost due to the vaccine injury, as opposed to the negative business impacts of the Pandemic or simply market vagaries. Accordingly, no lost wage award is appropriate. This does not, however, work a great injustice upon the Petitioner, since the pain and suffering award can be calculated to take into account the impact of her SIRVA on her ability to carry out her business interests.

### B. Pain and Suffering

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[6]

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult, with no impairments to her mental faculties or capacity. I therefore analyze principally the severity and duration of Petitioner's injury. In performing this analysis, I have reviewed the record as a whole, including all medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I also have taken into account prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and I rely upon my experience adjudicating these cases. However, I base my ultimate determination on the specific circumstances here.

Petitioner maintains an aware of $150,000.00 is appropriate. *See* Brief at 12 – 20; Reply at 3 – 8.[7] In contrast, Respondent argues for the lesser sum of $105,000.00. Response at 10 – 16.[8]

The medical records reflect that Petitioner's left shoulder pain began within 48 hours after the September 11, 2019, vaccination. Although the shoulder pain was not itself complained of *within* that timeframe, it was documented beginning 25 days later, and consistently thereafter. The initial treatment course included two primary care evaluations for shoulder pain especially with movement, prompting a 4-day course of oral steroids (in addition to over-the-counter Tylenol and ibuprofen).

Roughly two months post-vaccination, Petitioner's pain rated 5 – 6/10, particularly

---

[6] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[7] Citing R*eed v. Sec'y of Health & Hum. Servs.*, No. 16-1670V, 2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (awarding $160,000.00 for actual pain and suffering); *Wilson v. Sec'y of Health & Hum. Servs.*, No. 19-0035V, 2021 WL 1530731 (Fed. Cl. Spec. Mstr. March 18, 2021) ($130,000.00); *Nute v. Sec'y of Health & Hum. Servs.*, No.18-0140V, 2019 WL 6125008 (Fed. Cl. Spec. Mstr. Sept. 6, 2019) ($125,000.00).

[8] *Wilt v. Sec'y of Health & Hum. Servs.*, No. 18-0446V, 2020 WL 1490757 (Fed. Cl. Spec. Mstr. Feb. 24, 2020) (awarding $110,000.00 for actual pain and suffering); *Wylie v. Sec'y of Health & Hum. Servs.*, No. 20-1314V, 2022 WL 17968929 (Fed. Cl. Spec. Mstr. Dec. 7, 2022) ($108,000.00); *Weed v. Sec'y of Health & Hum. Servs.*, No. 18-1473V, 2021 WL 1711800 (Fed. Cl. Spec. Mstr. Mar. 30, 2021) ($105,000.00).

with movement, and she was first documented to have positive Neer's and Hawkins signs (indicating impingement). Shoulder movement was painful, if not objectively restricted. She was instructed on home exercises. She received a steroid injection (Kenalog) which relieved her pain temporarily.

But by about four months post-vaccination, on February 3, 2020, Petitioner's pain had *increased* to 7/10, Neers and Hawkins signs remained positive, and she was documented for the first time to have objective limitations in range of motion (specifically extension and internal rotation – although the *extent* of limitation is not specifically noted) leading to an assessment of adhesive capsulitis. A second steroid injection was administered, which did not provide any relief. The MRI findings also included a complete supraspinatus tear and mild osteoarthritis.

About six months post-vaccination, on March 20, 2020, Petitioner underwent surgery on her shoulder, which involved acutely worsened pain as evidenced by the orders for prescription-strength ibuprofen and Percocet.[9] She took these medications for approximately one month after surgery (the length of the prescriptions), by which point her pain had decreased to 3/10, and she had "improving" but still "limited" internal and external rotation, and her orthopedic surgeon authorized formal physical therapy ("PT").

At the April 24, 2020, PT initial evaluation, Petitioner had a similar pain rating and objective deficits. While she did not return to PT thereafter, the medical records reflect her discomfort with in-person encounters due to the Pandemic and that the therapist also provided a home exercise program via an online platform. I accept Petitioner's concerns during the height of the Pandemic as a credible explanation for avoiding in-person treatment. I also accept that her shoulder injury was sufficiently severe to at least partially disrupt her role (primarily between January and April 2020) as vice president of a small business, both "oversee[ing] its finances and administrative needs [and…] assist[ing] on sales calls and lighting installation jobs." Ex. 11 at ¶ 2.

The record similarly establishes that Petitioner followed her home exercise program for roughly three months, coinciding with her last orthopedics evaluation on July 27, 2020. At that time, the majority of her pain had subsided, and she was cleared to return to normal activities. Ex. 10 at 61 - 62.[10] Petitioner confirmed that her shoulder was

---

[9] A single medical record includes Petitioner's apparent report of taking oxycodone post-operatively, *see* Ex. 4 at 10, but no other references to oxycodone have been identified. This notation is likely incorrect and instead refers to the prescription for Percocet (5-325 mg, 30 tablets total, with no refills) to help manage Petitioner's post-surgical pain. *See e.g.*, Ex. 4 at 12, 16.

[10] Petitioner's Damages Brief at 4, 14 inaccurately characterizes Ex. 4 at 4 – 7, medical records from approximately eight months after the September 11, 2019, flu vaccine, that is May 19, 2020, as marking

doing well in subsequent primary care encounters. Ex. 10 at 10 – 20. Based on the medical record evidence, I conclude that Petitioner's SIRVA was moderately severe for approximately ten months, or through July 2020, at which point she had achieved at least a substantial recovery.

There is a question about Petitioner's status thereafter. Petitioner alleges her right shoulder "continued to deteriorate throughout the remainder of 2020 and 2021 [and…] was especially painful after periods of activity [but…] it was very difficult to obtain treatment for [her shoulder] because of shutdowns and restrictions related to the COVID-19 Pandemic." Ex. 11 at ¶¶ 12 – 13. But this account of an ongoing right shoulder injury is inadequately substantiated. The existing medical records indicate at least a substantial recovery, Petitioner did not respond to offers of PT "in clinic or via telehealth" in July 2020, Ex. 7 at 13; her orthopedist noted that she could return "as needed" but she never did so, Ex. 10 at 61; and she attended four primary care encounters for other concerns in August – December 2020. Ex. 10 at 10 – 20.

In addition, when Petitioner sought further treatment for her right shoulder in early 2022, she established care with new providers who did not record a history relating back to the September 2019 vaccination. An orthopedist did record such a history – but also that Petitioner had suffered a "recurrence" of right shoulder pain at some unspecified time, and that treater's assessments were post-surgical tightness, arthritis, and potentially cervical spine pathology. Ex. 12 at 17. The treater also maintained that she "may have some continued pain given her underlying mild arthritis," Ex. 12 at 12, which is distinguishable from a SIRVA. Overall, there is not preponderant evidence that Petitioner had ongoing right shoulder pain through 2020 – 22 that was at least substantially explained by her SIRVA, as would be necessary to incorporate into the damages award.

Petitioner maintains her case is comparable to *Reed* (awarding $160,000.00), which indeed featured a similar initial course (e.g., relatively prompt treatment and moderately severe pain leading up to surgery approximately six months post-vaccination). I do not assign a significant difference between the formal PT sessions seen in *Reed*, and this Petitioner's adherence to a home exercise program during spring – summer 2020. But the *Reed* opinion accepted that the individual in question had suffered residual pain and reduced range of motion that was attributable to her SIRVA for *over two years*, which caused long-term pain management issues and significant impacts on her personal life. 2019 WL 1222925, at *15 – 16. The same has not been shown in this case.

---

"the *final* post-operative follow-up appointment" (emphasis added). Petitioner avers that Ex. 4 at 4 - 7 supports a conclusion that Petitioner was discharged with "constant aching in her shoulder" and pain rating 5/10, which she argues, persisted until she returned for treatment in 2022. But Petitioner's framing omits the additional and truly final post-operative follow-up appointment on July 27, 2020, *see* Ex. 10 at 61 – 62.

7

*Nute* (awarding $130,000.00) is also factually distinguishable – because that individual received *three* cortisone injections during the initial treatment course; suffered moderate pain for a longer period, *nine months*, before undergoing surgery; and had less severe symptoms for an additional one to two months post-surgery. 2019 WL 6125008, at *11 – 12. And while Petitioner emphasizes that in *Nute*, a shoulder MRI's findings were *interpreted* as normal, *see* Brief at 20, the subsequent surgery revealed "significant bursitis" requiring a biceps tenodesis and other intervention, roughly comparable to the injury in this case. *Id.* at *3.[11]

Respondent correctly observes that like this case, *Weed*, *Wilt*, and *Wylie* (awarding between $105,000.00 - $110,000.00) each featured an initial moderately severe injury, surgical intervention, and substantial recovery within approximately ten months post-vaccination. However, I find that this Petitioner's initial injury was somewhat more severe, given that it required not only oral pain medications, but two steroid injections prior to surgery – and more post-operative orthopedic management. I also recognize the temporary stress and disruption to Petitioner's role in running a business as reasonably taken into account in the pain and suffering award. **Therefore in my discretion, I find that it is appropriate to make a higher award - $130,000.00 – for Petitioner's actual pain and suffering.**

## Conclusion

For all the reasons discussed above and based on consideration of the entire record, I find that Petitioner is entitled to damages in the form of a lump sum payment of **$134,085.12 (representing $130,000.00 for actual pain and suffering, plus $4,085.12 for actual unreimbursable expenses).[12]**

This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[13]

**IT IS SO ORDERED.**                          **s/Brian H. Corcoran**
                                                Brian H. Corcoran
                                                Chief Special Master

---

[11] Petitioner also cites *Wilson* (awarding $127,500.00) – but that is not an easy comparison because of factors including the *absence* of any cortisone injections and the initiation of PT *prior* to surgery. 2021 WL 1530731 at *3.

[12] The parties have stipulated to the expenses. Response at 16; Reply at 8.

[13] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.